IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| IN THE MATTER OF THE DETENTION OF<br><br>E.S.,<br><br><br><br>Appellant. | No. 86401-7-I<br><br>UNPUBLISHED OPINION |

BOWMAN, A.C.J. — E.S. appeals the trial court's order committing her for 14 days of involuntary treatment. She argues substantial evidence does not support the trial court's conclusions that she presents a likelihood of serious harm and is gravely disabled. She also argues the court erred by refusing to order a less restrictive alternative treatment and by failing to adequately advise her about the effect of involuntary commitment on her firearm rights. Because E.S. waived her argument about the court's advisement of her firearm rights and substantial evidence supports the court's conclusions that E.S. presents a likelihood of serious harm, that she is gravely disabled, and that a less restrictive alternative treatment is not in her best interests, we affirm.

FACTS

E.S. is 17 years old and the daughter of V.D. The evening of February 24, 2024, after about six months of E.S. showing increasingly hostile behavior, E.S. "jammed" V.D.'s head, foot, and right hand in a doorway and "repeatedly

slamm[ed]" the door on her, resulting in a concussion and foot injury. V.D. called the police, who arrested E.S. for assault and detained her at Ryther behavioral health agency. A mental health therapist at Ryther determined E.S. posed a serious risk of harm to herself and others, so he recommended E.S. be involuntarily hospitalized.

On February 27, 2024, Seattle Children's hospital (Children's) admitted E.S. for involuntary treatment. On March 4, Children's petitioned under chapter 71.34 RCW to provide E.S. 14 days of involuntary treatment. Children's alleged that E.S. presents a likelihood of serious harm to herself and others and that she is gravely disabled. Specifically, it alleged E.S. has unspecified psychosis, food restriction, medication nonadherence, and other psychiatric diagnoses. And that she "presents with a constricted/flat affect, tangential thought process, paranoid delusions, and rapid/pressured speech." Children's also alleged that E.S. experiences sleep impairment, irritability, and grandiosity and that she may have an eating disorder. Finally, the petition noted that E.S. has expressed suicidal ideation, acted violently toward family members, and been expelled from school "for threatening to kill other students (stemming from paranoid delusions)."

On March 5, the trial court held a probable cause hearing on Children's 14-day involuntary treatment petition. The court orally advised E.S. that

> the failure to make a good faith effort to seek voluntary treatment
> will result in the loss of your firearm rights if this [court] detains you
> for involuntary treatment. There should be a piece of blue paper
> there that has that advisement on it.

Then, Children's presented the testimony of V.D. and psychiatrist Dr. Margaret Wohlleber.

V.D. testified that E.S. at her baseline is "really thoughtful," generally cares "about her looks and her hygiene," and sleeps and eats regularly. But V.D. noticed that over the last six months, E.S.'s behavior changed. She said E.S. seemed withdrawn and began acting controlling and hostile. And she testified that E.S. ate less, lost weight, and during one week in February, only "slept twice for a couple hours."

V.D. testified about several incidents demonstrating these behavioral changes. She first testified about an incident that occurred on February 2, 2024. V.D. knocked on the bathroom door and E.S. unlocked it, jumped out of the shower, grabbed V.D.'s shoulders, and yelled at her. V.D. said E.S. had an "absence in her eyes" and spoke incoherently about the FBI. V.D. testified that after the incident, E.S. "started creating large shrines all over the house with like my pictures cut up and saying . . . she just needs to collect more clues to . . . hurt me and hurt her sisters."

V.D. also testified about an incident on February 9 when E.S. "viciously attacked" her. She said E.S. grabbed her hand and "jammed it . . . in the bathroom door," "hitting [her] hand repeatedly." Finally, V.D. testified about the February 24 incident before E.S.'s hospitalization when she looked into E.S.'s room because she heard screaming and furniture breaking. E.S. grabbed V.D.'s left arm, jammed V.D.'s head, foot, and right hand in the doorway, and slammed the door repeatedly. V.D. fell on the floor and suffered a concussion and foot injury. V.D. called the police and they took E.S. to jail. V.D. acknowledged that E.S. has improved in the hospital but said that she would be concerned if

3

Children's released E.S. because she is "out of touch with reality" and a "danger to herself and others."

Dr. Wholleber testified that she admitted E.S. to the psychiatric unit at Children's and checked on her daily. She testified that in her first interaction with E.S., E.S. presented as "psychotic with significant paranoid delusions" and exhibited "overt signs and symptoms of a manic episode" and possibly an eating disorder. Dr. Wholleber opined that E.S. presents a substantial risk of physical harm to herself and others. And that E.S. is currently disabled as a result of her mental disorder because she cannot provide for her essential health and safety needs. She also testified that E.S. shows severe deterioration in routine functioning and has shown suicidal ideations. Dr. Wholleber added that E.S. is "significantly malnourished" and "not stabilized." For these reasons, Dr. Wholleber recommended inpatient treatment. She opined that without it, E.S. had a "high risk of relapse and readmission to the hospital" and her "violent behaviors could potentially escalate."

E.S. testified on her own behalf. She said she felt stable enough to go home and would continue taking her medication if discharged. But she testified she would not be comfortable returning to the hospital to discuss any concerns unless it was mandatory. When asked if she would return for a checkup, she said yes, but she "would be worried that they would keep me here again when I escape. Because they're getting paid for me being a patient here." She testified that she would continue her medication "because [she] want[s] to get better" but said that "in the future, I won't be needing that." She denied ever intentionally

4

slamming V.D.'s hand in a door and denied that any incident occurred where she slammed a door on V.D.'s head.

The trial court ordered 14 days of involuntary commitment. It informed E.S. she was "barred from possessing firearms" and may not possess any "until a court restores [her] right to do so." After the hearing, the court entered findings of fact and conclusions of law. It found that E.S. currently has a behavioral health disorder and, as a result, presents a likelihood of serious harm to herself and others. And that she is a gravely disabled minor under prongs (a) and (b) of RCW 71.34.020(27).[1] It also found E.S. needs inpatient treatment and a less restrictive alternative is not in her best interests because she is "not mentally stable . . . and has a high risk of relapse and readmission."

E.S. appeals.

ANALYSIS

E.S. argues substantial evidence does not support the trial court's conclusion that she should be involuntarily committed under RCW 71.34.740(9) and that the trial court erred by not ordering a less restrictive alternative treatment. E.S. also asserts the court failed to adequately advise her about the effect of involuntary commitment on her firearm rights.

1. Involuntary Treatment under RCW 71.34.740(9)

E.S. contends substantial evidence does not support her commitment for involuntary treatment. She argues the evidence does not show she presents a likelihood of serious harm or is gravely disabled. We disagree.

---

[1] *See also* RCW 71.34.740(9)(a).

Because the trial court has weighed the evidence, we limit our review to whether substantial evidence supports the trial court's findings and whether those findings support the court's conclusions of law. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is evidence sufficient " 'to persuade a fair-minded person of the truth of the declared premise.' " *In re Det. of A.S.*, 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)), *aff'd*, 138 Wn.2d 898, 982 P.2d 1156 (1999). Unchallenged findings of fact are verities on appeal. *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty which the State cannot accomplish without due process of law." *LaBelle*, 107 Wn.2d at 201. To involuntarily commit a minor for 14 days, the court must find the following by a preponderance of the evidence:

> (a) The minor has a behavioral health disorder and presents a likelihood of serious harm or is gravely disabled;
> (b) The minor is in need of evaluation and treatment of the type provided by the inpatient evaluation and treatment facility, secure withdrawal management and stabilization facility, or approved substance use disorder treatment program to which continued inpatient care is sought or is in need of less restrictive alternative treatment found to be in the best interests of the minor or others; and
> (c) The minor is unwilling or unable in good faith to consent to voluntary treatment.

RCW 71.34.740(9).

A. Likelihood of Serious Harm

E.S. argues substantial evidence does not support the trial court's conclusion that she poses a likelihood of serious harm under RCW 71.34.740(9)(a). E.S. asserts that no evidence shows "an ongoing concern that [she] would harm herself or anyone else."

Under chapter 71.34 RCW, a "likelihood of serious harm" means

> (a) [a] substantial risk that: (i) Physical harm will be inflicted by a minor upon his or her own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on oneself; (ii) physical harm will be inflicted by a minor upon another individual, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm; or (iii) physical harm will be inflicted by a minor upon the property of others . . . ; or
> (b) The minor has threatened the physical safety of another and has a history of one or more violent acts.

RCW 71.34.020(39).

Here, the trial court concluded that E.S. presents a likelihood of serious harm to both herself and others under RCW 71.34.020(39)(a)(i) and (ii). First, the court found there is a substantial risk that E.S. will inflict physical harm on herself. It found that E.S. "expressed suicidal ideation to her treating physician and said that she wants to create a suicide forest in her backyard with a plan to hang herself from a tree." The court also found there is a substantial risk that E.S. will inflict physical harm on another person, "as evidenced by behavior which has caused such harm or which places another person . . . in reasonable fear of sustaining such harm." It found that E.S. "has become more aggressive verbally" over the last six months. She has "grabbed her mother physically by her shoulders resulting [in] her mother being in fear for her safety." And about

7

eight days before the hearing, E.S. "repeatedly slammed her mother[']s head in the door resulting in a concussion and a foot injury." These findings of fact support the court's conclusion that E.S. presents a likelihood of serious harm to herself and others under RCW 71.34.740(9)(a).

E.S. asserts the findings of fact do not show she posed a likelihood of serious harm "at the time of her hearing." Relying on *In re Detention of Harris*, E.S. argues the State needed to show she had an "ongoing intent" to harm herself or others. 98 Wn.2d 276, 654 P.2d 109 (1982). But in *Harris*, our Supreme Court rejected the petitioner's argument that dangerousness must be "imminent" to justify involuntary detention.[2] *Id.* at 281-82. It reasoned that such a requirement would create "a standard that (in many cases) would invalidate commitment as soon as it occurs." *Id.* at 284. That is because "the practical effect of being placed in the hospital will usually eliminate the 'imminence' of one's dangerousness." *Id.* The court held that the evidence must show only "a substantial risk of physical harm as evidenced by a recent overt act," which may be an act that "has caused harm or creates a reasonable apprehension of dangerousness." *Id.* at 284-85.

Here, the evidence supports the court's findings that E.S. committed recent and overt acts showing a substantial risk of physical harm. Dr. Wholleber testified that E.S. "has overtly stated suicidal thoughts." And E.S.'s recent overt acts toward her mother shows she also posed a "likelihood of serious harm" to

---

[2] While *Harris* interprets a "likelihood of serious harm" under chapter 71.05 RCW, which concerns involuntary commitment for adults, not minors, the definition's language is effectively the same as that in chapter 71.34 RCW. *See Harris*, 98 Wn.2d at 278-79; *compare* RCW 71.05.020(37), *with* RCW 71.34.020(39).

others.  For example, V.D. testified that just eight days before the hearing, E.S. slammed her head in a door, giving her a concussion and foot injury.  And V.D. said she would have concerns for her own safety if the hospital released E.S., demonstrating her reasonable apprehension of E.S.'s dangerousness.[3]

The court's findings of facts support its conclusion that E.S. presents a likelihood of serious harm.

B.  Gravely Disabled

E.S. also argues substantial evidence does not support the court's conclusion that she is gravely disabled.

Under chapter 71.34 RCW, "gravely disabled minor" means

> a minor who, as a result of a behavioral health disorder, (a) is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.34.020(27).  Here, the trial court concluded that E.S. is gravely disabled under both subsections (a) and (b) of RCW 71.34.020(27).

I.  Gravely Disabled under RCW 71.34.020(27)(a)

Subsection (a) of the "gravely disabled" definition requires

> recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical

---

[3] E.S. also cites *In re Detention of V.B.* to argue that the evidence must show that a likelihood of serious harm to herself or others is "still present at the time of the commitment hearing."  104 Wn. App. 953, 19 P.3d 1062 (2001).  But E.S. reads *V.B.* too narrowly.  *V.B.* says the State must show that the detainee is "presently in need of treatment."  *Id.* at 963 (emphasis omitted).  And here, the court found that E.S. presently needs treatment, stating that she "currently suffers from a mental impairment."

> treatment which presents a high probability of serious physical
> harm within the near future unless adequate treatment is afforded.

*LaBelle*, 107 Wn.2d at 204-05.[4]  And the evidence must show the person's failure

to provide for these essential needs is because of a "mental disorder and not

because of other facts." *Id.* at 205.  But the resulting risk of harm need not be

" 'imminent.' " *Id.* at 203.

Here, the trial court found that E.S. presented in the hospital as "severely

malnourished," is not eating because she believes the food is "spiked," and

continues to exhibit paranoia.  It found that she lost weight and that if Children's

discharged her, there is a high risk she would continue not to eat.  It noted that

E.S. said she would prefer not to take medication and will not need it in the

future.  And that V.D. also believed E.S. would not take her medication if

released.  These findings support the court's conclusion that E.S. is gravely

disabled under RCW 71.34.020(27)(a).

E.S. contends some of these findings are unsupported by substantial

evidence.  She argues, "There was no testimony to indicate that access to food,

clothing, shelter, or medical treatment would be a problem" for her.  But the

record shows otherwise.  Dr. Wholleber testified about how E.S. said she refused

to eat and drink in the hospital because "she does not trust anyone here and

thinks that the water is spiked."  She also said that E.S. is "significantly

malnourished" and at "high risk for refeeding syndrome, which is life threatening."

---

[4] While *LaBelle* interprets "gravely disabled" under chapter 71.05 RCW, which concerns involuntary commitment for adults, not minors, the definition's language is effectively the same as that in chapter 71.34 RCW.  *See LaBelle*, 107 Wn.2d at 201-02; *compare* RCW 71.05.020(25), *with* RCW 71.34.020(27).

V.D. testified that when she tried to give E.S. her medicine, E.S. refused, scattered it throughout the house, and claimed it was "laced."  And E.S. herself testified that "in the future, [she] won't be needing" medication.

E.S. also asserts there was evidence she had the support necessary to continue her medication outside the hospital.  But Dr. Wholleber testified there was no confirmation that E.S. had sufficient support in place, which would include an "appointment date with the right specialist."  Finally, E.S. argues no evidence shows that her "possible eating disorder" "stemmed from a behavioral health disorder."  But Dr. Wholleber testified about her concern that E.S.'s psychotic symptoms were contributing to her lack of eating.  So, substantial evidence supports the trial court's findings of fact.

## II.  Gravely Disabled under RCW 71.34.020(27)(b)

Under subsection (b) of the "gravely disabled" definition, the State's evidence "must include recent proof of significant loss of cognitive or volitional control."  *LaBelle*, 107 Wn.2d at 208.  And it "must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety."  *Id.*  The involuntary treatment care must be essential to the person's health or safety.  *Id.*

Here, the trial court found E.S. had "severe[ ] deterioration in routine functioning, evidenced by repeated and escalating loss of cognitive and volitional control" over her actions, and could not receive the necessary care outside of a hospital setting.  It found she recently became increasingly aggressive, resulting in her hospitalization and juvenile detention.  And that she will not consume

11

enough food outside the hospital. Finally, the court found that after hospitalization, E.S. still "is not fully stabilized or back at baseline." These findings support the court's conclusion that E.S. is gravely disabled under RCW 71.34.020(27)(b).

E.S. challenges these findings as unsupported by substantial evidence. She argues no evidence shows she severely deteriorated from her baseline. But V.D. testified that at E.S.'s baseline, she is kind, cares about her hygiene, eats regularly, and sleeps normally. And that over the last six months, E.S. has become verbally and physically hostile, refused to eat, and once slept only a few hours in one week. Dr. Wholleber testified that E.S. was at first not sleeping at the hospital "but has begun to sleep more the past few days." Still, she said E.S.'s food intake "continues to be concerning and reduced."

E.S. also argues the record does not support that she could not "manage her health and safety outside of the hospital." But Dr. Wholleber said she was concerned E.S. could not care for herself, and without treatment, there is a risk of relapsing psychosis, continued malnutrition, and readmission to the hospital. So, substantial evidence supports the court's findings of fact.

The court's findings of fact support its conclusion that E.S. is gravely disabled under both subsections (a) and (b) of RCW 71.34.020(27).

2. Less Restrictive Alternative Treatment

E.S. argues the trial court erred by failing to consider and order a less restrictive alternative treatment. We disagree.

For a 14-day involuntary commitment, the trial court must find either that the minor needs inpatient evaluation and treatment or that there is a "less restrictive alternative treatment found to be in the best interests of the minor or others."  RCW 71.34.740(9)(b).  And if the court finds the minor meets all the criteria for a 14-day commitment, it "shall either authorize commitment of the minor for inpatient treatment or for less restrictive alternative treatment upon such conditions as are necessary."  RCW 71.34.740(10).  So, the statute directs the court only to consider whether a less restrictive alternative is in the minor's best interests.  *See* RCW 71.34.740(9)(b), (10).[5]

Here, the court concluded that a less restrictive alternative treatment is neither appropriate nor in E.S.'s best interests because she is "not mentally stable" and has a "high risk of relapse and readmission."  It found she has "poor insight into her situation and mental health concerns," which does not "bode well for compliance with a less restrictive treatment order at this time."  These findings support the court's conclusion that a less restrictive treatment was not in E.S.'s best interests.

E.S. argues substantial evidence does not support the court's findings. First, she asserts no testimony supports that she posed a high risk of readmission.  But Dr. Wholleber testified that without inpatient treatment, E.S.

---

[5] Citing RCW 71.34.240, E.S. argues the court must consider whether a less restrictive alternative is in the minor's best interests and, if so, the court "shall" order it. But no such statute exists.  *See* ch. 71.34 RCW.  Instead, that language is found in RCW 71.05.240(4)(c), an adult involuntary treatment statute.

faced a "high risk of relapse and readmission to the hospital." She stated:

> [E.S.] has had a stretch now of about a month of . . . inpatient hospitalization, discharge, quickly relapse, became more violent because she wasn't taking her medications. Ended up in detention, which I also find a safety issue for her because she's not going to get the right amount of treatment. And so I really want to make sure that . . . we have her . . . at a point where she's able to have a little bit more insight into her treatment here and can appropriately adhere once she's discharged from the hospital.

E.S. also argues there was testimony showing she "had insight into her condition" and evidence that V.D. "found care to support outpatient treatment." Even so, there was also testimony that E.S. lacked insight into her condition and did not have the necessary care arranged for outpatient treatment. And we will not reweigh the evidence on appeal. *See LaBelle*, 107 Wn.2d at 209.

Substantial evidence supports the court's conclusion that a less restrictive alternative treatment is not in E.S.'s best interests.

3. Notice of Loss of Firearm Rights

Finally, E.S. argues the trial court failed to adequately advise her, orally and in writing, that involuntary commitment would result in the loss of her firearm rights. The State argues that E.S. waived this argument by failing to object and that we should not consider it because E.S. fails to show manifest constitutional error. We agree with the State.

Generally, we do not consider unpreserved errors raised for the first time on appeal. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) (citing RAP 2.5(a)). We follow this approach because a party's failure to object deprives the trial court of an opportunity to prevent or correct the error. *See id.* at 935.

14

Still, we may review the alleged error if the appellant shows it is a manifest constitutional error. *Id.* at 926-27; RAP 2.5(a)(3). To establish manifest constitutional error, an appellant must "identify a constitutional error and show how, in the context of the trial, the alleged error actually affected [their] rights." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

At the probable cause hearing, the court orally advised E.S. about her firearm rights and directed her to the "piece of blue paper . . . that has that advisement on it." E.S. did not object to the advisement. Nor did she object to any absence of written notice about her firearm rights. E.S. raises this issue for the first time on appeal but fails to argue in her opening brief that any error is a manifest constitutional error warranting our review. Nor does she show in her opening brief or in her reply brief,[6] as required by RAP 2.5(a)(3)'s manifest constitutional error standard, that the alleged error actually affected her rights given the trial court's clear reference to the "piece of blue paper . . . that has that advisement on it." The record lacks any indication that further advisement would have resulted in a different outcome. As a result, we do not consider this challenge.

---

[6] E.S. addresses manifest constitutional error for the first time in her reply brief. An "issue raised and argued for the first time in a reply brief is too late to warrant consideration." *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Because substantial evidence supports the court's conclusions that E.S. is likely to commit serious harm, that she is gravely disabled, and that a less restrictive alternative treatment is not in her best interests, we affirm.

_____, ACJ

WE CONCUR:

Feldman, J.